UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE NANTUCKET WINE & FOOD FESTIVAL, LLC, et al., | ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil No. 24-11640-LTS |
| GORDON COMPANIES, INC., et al., | ) ) ) |  |
| Defendants. | ) ) |  |

ORDER ON MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DOC. NO. 34)

October 31, 2024

SOROKIN, J.

Plaintiffs The Nantucket Wine & Food Festival, LLC, ("NWF") and Nancy Bean (collectively, "Plaintiffs") run a four-day-long wine-and-food festival on Nantucket each May. They accuse defendants Gordon Companies, Inc., and David Gordon (collectively, "the Gordon Parties") of planning their own wine-and-food event for 2025 and attempting to pass it off as a newly acquired and rebranded version of Plaintiffs' festival.  Plaintiffs allege defendant White Elephant Hotel LLC aided the Gordon Parties in this effort, and, as a result, Plaintiffs assert five claims against White Elephant.  Before the Court is White Elephant's motion to dismiss all claims against it under Federal Rule of Civil Procedure 12(b)(6).  Doc. No. 34.[1]  For the reasons below, that motion is ALLOWED IN PART and DENIED IN PART.

---

[1] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header.

I.  BACKGROUND

  A.  Facts[2]

NWF has hosted the Nantucket Wine & Food Festival ("the Festival") annually since 1996.  Doc. No. 32 ¶ 19.  Bean joined the team as Director of Operations in 2007.  Id. ¶ 20.  In 2013, she purchased NWF with a partner—whom she later bought out—and has acted as its Executive Director ever since.  Id.

White Elephant has acted as the Festival's primary host venue for roughly the last decade.  Id. ¶ 19.  For each of the last three years, White Elephant has done so pursuant to a series of one-year contracts with NWF.  Id. ¶ 35.  NWF and White Elephant executed the most recent version of their annual Wine Festival Agreement ("the Agreement") on February 2, 2024, thereby committing White Elephant to act as the official host venue of the Festival again in 2024.  Id. ¶ 36; see also Doc. No. 32-1 at 1–14.[3]

The Gordon Parties primarily run a regional liquor and wine retail and distribution business.  Doc. No. 32 ¶ 24.  In 2022, the Gordon Parties began discussions with Bean about potentially taking over management of the Festival.  Id. ¶¶ 27, 45.  At one point, the Gordon Parties connected Bean with their usual attorney, defendant Todd Goldberg, who provided his legal advice when Bean bought out her then-partner in NWF.  Id. ¶ 28.  However, in the run up to the 2024 Festival, Bean put her discussions with the Gordon Parties on hold.  Id. ¶ 46.

The 2024 Festival, held from May 15 to May 19, drew "rave reviews" and made "a full comeback to pre-pandemic success."  Id. ¶ 42.  Then the trouble started.  On June 17, 2024, the

---

[2] The following factual allegations are taken from the Amended Complaint, Doc. No. 32, which the Court accepts as true at this stage, as the law requires.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).
[3] The Agreement is attached to the Amended Complaint as an exhibit, and no party challenges its authenticity.  As such, the Court may properly consider the Agreement in ruling on the present motion to dismiss.  Newman v. Krintzman, 723 F.3d 308, 309 (1st Cir. 2013).

2

Gordon Companies issued two press releases stating that it had acquired the Festival, which would be rebranded as "the Nantucket Food and Wine Experience" (the "Experience") and would run from May 14 to May 18, 2025.  Id. ¶¶ 49–50; see also Doc. No. 32-1 at 15–20.  As relevant here, the Gordon Companies also issued a third press release that day.  Doc. No. 32 ¶ 59; see also Doc. No. 14-1.  The heading of the press release reads: "The Gordon Companies Partner with The White Elephant to Present a Newly Branded Nantucket Food & Wine Experience."  Doc. No. 14-1 at 2.  A subheading refers to the Experience as "[o]ne of the nation's longest running food and wine events."  Id.  The press release goes on to quote White Elephant president Khaled Hashem as saying: "We are honored that our harborside hotel will continue to serve as the official host for this dynamic partnership with The Gordon Companies. We look forward to carrying on the tradition of providing food and wine excellence for locals and visitors alike on beautiful Nantucket."  Id. at 2.[4]

But Bean never sold NWF or any rights to the Festival.  Doc. No. 32 ¶ 64.  In fact, NWF had already sent out a save-the-date for its 2025 Festival, to be held from May 14 to May 18, 2025, the same dates as the Gordon Companies' Experience.  Id. ¶ 47.  As a result of the Gordon Companies' press releases, Bean received a "barrage of inquiries" regarding the status of the

---

[4] Unlike the other two press releases, Doc. No. 32-1 at 15–20, Plaintiffs did not append this third press release to the Amended Complaint.  Instead, the Amended Complaint features only an excerpt of the Hashem statement included in the press release.  Doc. No. 32 ¶ 59.  However, both Plaintiffs and White Elephant include the full quote by Hashem in their motion papers.  Doc. No. 35 at 10 (White Elephant); Doc. No. 46 at 10 (Plaintiffs).  White Elephant also attached the full press release as an exhibit to an affidavit of Hashem filed earlier in this case.  Doc. No. 14-1.  Because the Amended Complaint's factual allegations are expressly linked to this press release and because no party disputes the authenticity of the copy filed by White Elephant, the Court may properly consider the full press release in ruling on the present motion.  Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998) ("When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

2025 Festival.  Id. ¶ 65.  While the Gordon Companies issued follow-up statements clarifying that it had not "acquired" NWF or the Festival, id. ¶¶ 66, 81, White Elephant has not issued any statement of clarification or retraction in response to Hashem's quote, id. ¶ 59.  White Elephant did, however, withdraw NWF's authorization to use the White Elephant logo granted by the Agreement.  Id. ¶ 126.  According to Plaintiffs, this was all done pursuant to a plan by the Gordon Parties and White Elephant to "gain[] access to Plaintiffs' proprietary information" via Goldberg, "misus[e] that proprietary information to create a separate event, and then pass[] it off as the genuine Nantucket Wine & Food Festival while falsely claiming the Gordon Parties and White Elephant had acquired it in partnership with each other."  Id. ¶ 145.

    B.       Procedural Posture

In response to the above, Plaintiffs sued not only the Gordon Parties but also White Elephant (and Goldberg, for alleged legal malpractice).  Together, Plaintiffs assert claims against White Elephant for commercial disparagement, tortious interference with prospective economic advantage, and civil conspiracy.  NWF also brings its own claims—without Bean—for breach of contract and violation of Massachusetts General Laws chapter 93A ("Chapter 93A").  White Elephant seeks to dismiss all of these counts for failure to state a claim upon which relief can be granted under Rule 12(b)(6).  Doc. No. 34.  Plaintiffs have opposed the motion, Doc. No. 46, and White Elephant has replied, Doc. No. 51.  Although White Elephant requested a motion hearing, the Court finds a hearing unnecessary and decides White Elephant's motion on the papers.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference

4

that the defendant is liable for the misconduct alleged." Id.  This does not require the Court to accept legal conclusions stated in the complaint as true, and the plausibility standard requires more than a mere possibility of a defendant's liability.  Id.

III.   DISCUSSION

The Court considers each claim in turn, following the order the parties used in their motion papers.  For those claims brought by Plaintiffs together, the Court analyzes first NWF's claim then Bean's claim.

   A.   Count IV: Breach of Contract

The Amended Complaint plausibly alleges that White Elephant breached the Agreement.  The Court understands NWF to be asserting that White Elephant committed breach in essentially three ways: (1) by "collud[ing] to hold a separate copycat event masquerading as the original" Festival; (2) by "participat[ing] actively in the misuse of the Nantucket Wine & Food Festival, LLC's intellectual property"; and (3) by generally failing to provide NWF with its "prestige and goodwill" and "withdraw[ing] its contractual authorization for use of its logo by" NWF.  Doc. No. 32 ¶ 126.

The Court briefly reviews the relevant provisions of the Agreement.  In its preamble, the Agreement states that the parties desire "to promote both the Festival and the White Elephant as the Host Hotel Sponsor for the Festival for the term and upon the conditions set forth in this Agreement."  Doc. No. 32-1 at 1.  The Agreement includes several provisions for such promotion.  Section 2.4 commits NWF and White Elephant to "cross-promote each other by linking their respective websites."  Id. § 2.4(b).  Section 3.2 states that "the White Elephant logo shall receive the following exposure: . . . a prominent location on the Front/Home Page and the Sponsor Page of the NWF website."  Id. § 3.2(b).  And Section 5.6 requires that White Elephant "arrange for or provide . . . [t]he prestige and goodwill of the White Elephant."  Id. § 5.6(a).

Despite this cross-promotion, though, the Agreement provides that NWF "owns the exclusive rights" to its logo and name. Id. § 3.1. Finally, the "term" of the Agreement was to "continue through December 31, 2024, or such later date on which all payments due from one Party to the other are received." Id. § 1.1.

Only NWF's third theory of breach plausibly states a claim for relief. NWF's first theory—based on White Elephant's "collud[ing] to hold a separate copycat event masquerading as the original," Doc. No. 32 ¶ 126—fails for lack of a relevant contractual provision. The Agreement does not prohibit White Elephant from hosting a non-NWF food-and-wine event in 2025. Moreover, as discussed in Section III.E, infra, the Amended Complaint does not contain sufficient factual allegations to support the conclusion that White Elephant so colluded.

NWF's second theory—that White Elephant "participated actively in the misuse of the Nantucket Wine & Food Festival, LLC's intellectual property"—also falls short. Section 3.1 of the Agreement does protect NWF's intellectual property, but the Amended Complaint does not allege any misuse of the NWF logo or name by White Elephant. In fact, the press release containing Hashem's statement nowhere includes the NWF logo or any of its names.[5]

NWF's third theory, however, sufficiently alleges breach. This theory primarily relies on the Agreement's prestige-and-goodwill provision of section 5.6(a). As a threshold matter, White Elephant argues that section 5.6(a) only entitles NWF to the prestige and goodwill of White Elephant through the dates of the 2024 Festival. This presents an issue of contract interpretation.

---

[5] NWF also points to an Instagram post, made by White Elephant on May 13, 2024, which stated: "Food & Wine Fest is almost here, and we're getting in the spirit at White Elephant! For a limited time only, shop our wine-inspired baseball caps in-store." Doc. No. 32 ¶ 60. While this post used the same order of "food" and "wine" as the Gordon Parties' "Food and Wine Experience," this misnaming does not support NWF's theory of breach. Given that the post did not infringe on NWF's name, was made in support of NWF's Festival, and came a month before the Gordon Parties announced their Experience, no plausible claim for breach arises.

6

When interpreting a contract at the motion-to-dismiss stage, the Court must first determine whether the language of the contract is ambiguous.  Sonoiki v. Harvard Univ., 37 F.4th 691, 703 (1st Cir. 2022).  If it is, then the Court need not resolve those ambiguities at this stage, and the breach-of-contract claim proceeds.  Sonoiki, 37 F.4th at 703.  "Contractual language is ambiguous when it can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken."  Balles v. Babcock Power Inc., 70 N.E.3d 905, 911 (Mass. 2017) (quotations omitted).  Here, the Agreement is at least ambiguous as to the duration of White Elephant's obligations under the prestige-and-goodwill provision.  The "term" of the Agreement extends until December 31, 2024.  Doc. No. 32-1 § 1.1.  Elsewhere in section 5.6, the Agreement expressly limits White Elephant's obligations to "during the Festival," id. § 5.6(b), (d), or to "all of the events at any WER property," id. § 5.6(c), but section 5.6(a) contains no such language.  Additionally, NWF has plausibly alleged a course of dealing with White Elephant that suggests the parties contemplated that their obligations would extend past the Festival itself.  Doc. No. 32 ¶ 62 (alleging that "routinely as a matter of course as it has been in previous years, the relationship . . . extends beyond the actual dates of the festival" with "substantial post-production work that involves . . . enhancing the business, and promotion of festival merchandise"); see Balles, 70 N.E.3d at 911 ("[A] court may consider extrinsic evidence if the language is ambiguous.").  Given the contract's ambiguity and this alleged course of dealing, it is plausible that section 5.6(a) binds White Elephant through December 31, 2024.

The Amended Complaint plausibly alleges that White Elephant failed to provide its prestige and goodwill through the end of that term.  The Agreement does not convey an exclusive right to White Elephant's prestige and goodwill, and White Elephant is free to contract with third parties, as NWF concedes.  Doc. No. 46 at 12.  But NWF has plausibly laid out the

7

ways in which White Elephant was obligated to work with NWF after completion of the festival, such as by "enhancing the business" and through "promotion of festival merchandise." Doc. No. 32 ¶ 62. White Elephant plausibly failed in those duties, and thereby violated section 5.6(a), in prohibiting NWF from using its logo for the remainder of the year.[6] The Agreement and the parties' alleged course of dealing at least entitles NWF to use of the logo for post-Festival sales and promotion on the Festival website. Whether that entitlement extends to NWF's promotion of the 2025 Festival is less certain and need not be resolved at this time. Broadly, while White Elephant could contract for and promote the Gordon Parties' 2025 Experience, it could not withdraw its prestige and goodwill from NWF by failing to support NWF in the post-production activities that the Agreement contemplates. The motion to dismiss Count IV is DENIED.

B.     Count VII: Commercial Disparagement

NWF adequately pleads commercial disparagement against White Elephant, as well. To state a claim for commercial disparagement under Massachusetts law, a complaint must allege that the defendant:

> (1) published a false statement to a person other than the plaintiff; (2) "of and concerning" the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss.

HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013). Here, the Amended Complaint satisfies each of those elements with respect to the Hashem statement.

First, the Hashem statement is plausibly false and was published to a wide audience. It appeared in a press release, and it stated that White Elephant would "continue to serve as the

---

[6] Although NWF also cites section 3.2 as a basis for this breach, Doc. No. 46 at 12, that section merely requires NWF to give the White Elephant logo "exposure" in "a prominent location on the Front/Home Page and the Sponsor Page of the NWF website," Doc. No. 32-1 § 3.2(b). That is, that provision imposes an obligation on NWF, not White Elephant.

official host for this dynamic partnership with The Gordon Companies." Doc. No. 14-1 at 2.  In the context of the whole press release, reasonable inferences support reading that language as implying that the Experience would be a continuation of the Festival.  According to the Amended Complaint, no such relationship between the Experience and the Festival existed.  Doc. No. 32 ¶ 68.  Thus, the Hashem statement was plausibly false.

Second, the Hashem statement was of and concerning NWF's Festival.  The "of and concerning" element is satisfied if "persons could reasonably interpret the defendant's words to refer to the plaintiff and . . . the defendant was negligent in publishing them in such a way that they could be so understood." HipSaver, 984 N.E.2d at 766 (quotations omitted).  Here, the Amended Complaint plausibly alleges that a person could reasonably interpret the Hashem statement as referring to NWF and its Festival.  The press release in which the Hashem statement ran featured the subheading, "[o]ne of the nation's longest running food and wine events returns to Nantucket on May 14–18, 2025." Doc. No. 14-1 at 2.  In this context, Hashem's language about "continu[ing] to serve as the official host" could be read to refer to NWF's long-running Festival, especially since, as NWF alleges, White Elephant has been the primary venue for its Festival for the last ten years, Doc. No. 32 ¶ 19.  The Amended Complaint also alleges that third parties did so read it.  Bean "received a barrage of inquiries about the 'purchase,'" and "local residents and prominent members of the wine and culinary community worldwide" came to "believe that she had sold the Nantucket Wine & Food Festival and was no longer involved in the event." Doc. No. 32 ¶ 65; cf. HipSaver, 984 N.E.2d at 767 ("HipSaver has presented no affidavits from third parties prepared to testify that they understood the article as referring to or being about HipSaver and its product.").  The Court reasonably infers that this alleged course of events occurred as a result, at least in part, of the Hashem statement.

9

Third, NWF plausibly alleges that White Elephant acted with at least a reckless disregard as to the truth of the Hashem statement. This element requires that White Elephant "entertained serious doubts as to the truth of [its] publication." HipSaver, 984 N.E.2d at 768. By the time of the Hashem statement, NWF had already "sent out correspondence to vendors, exhibitors and sponsors with the 'Save the Date' for May 14–18, 2025." Doc. No. 32 ¶ 47 (emphasis added). As a recurring sponsor, then, White Elephant plausibly had notice that NWF planned to hold its own 2025 Festival. Yet the Hashem statement implied that the Gordon Companies' Experience would displace NWF's Festival. It is possible that White Elephant truly believed that the Gordon Companies had purchased the Festival between the time NWF sent its "Save the Date" and the time of the Hashem statement. However, the Court must draw all reasonable inferences in Plaintiffs' favor, and it is reasonable to infer that White Elephant had some awareness that the Experience was not a continuation of the Festival. According to the Amended Complaint, White Elephant "participated knowingly and actively" in the press release containing the Hashem statement. Doc. No. 32 ¶ 59. Both the Hashem statement and the broader press release refer to a "partnership" between White Elephant and the Gordon Companies. Doc. No. 14-1 at 2. Finally, unlike the Gordon Companies, White Elephant never issued any statement to correct any false impressions the Hashem statement may have created. Doc. No. 32 ¶ 59. These circumstances, taken together, establish that NWF has plausibly alleged that White Elephant acted with reckless disregard for the truth.[7]

Fourth, pecuniary harm to NWF was plausibly foreseeable based on the allegations in the Amended Complaint. Given notice that NWF was holdings its Festival in 2025, Doc. No. 32 ¶

---

[7] The Court does not rely on White Elephant's Instagram post from May 13, 2024, in making this determination. See supra note 5.

10

47, White Elephant should have reasonably foreseen that a plausibly defamatory statement suggesting that another entity had taken over the festival would harm NWF's business.

Fifth, pecuniary harm plausibly resulted from the Hashem statement. When a false statement has been "widely disseminated," the plaintiff satisfies this element "by circumstantial evidence showing that the loss [of a market] has in fact occurred, and eliminating other causes." HipSaver, 984 N.E.2d at 772 (alteration in original) (quotations omitted) (quoting Restatement (Second) of Torts § 633 cmt. h (Am. L. Inst. 1977)). Here, the Hashem statement received wide dissemination via a press release. The Amended Complaint alleges confusion among local residents and the wine-and-culinary community, leading to "the ongoing belief by many industry participants that the Nantucket Wine & Food Festival no longer operates separately from the Nantucket Wine and Food Experience." Doc. No. 32 ¶¶ 65, 87. This confusion plausibly traces back, in part, to the Hashem statement, and it is reasonable to infer that NWF would lose ticket sales and vendor contracts based on that confusion.

In sum, NWF plausibly alleges commercial disparagement by White Elephant. Although the issue is a close one, Bean's commercial-disparagement claim also survives. White Elephant contends that the Hashem statement is not "of and concerning" Bean, Doc. No. 35 at 24, but Bean plausibly has such identity with the Festival and NWF that this element is met. According to the Amended Complaint, Bean began serving as the Festival's Director of Operations in 2007 and has been an owner and the Executive Director of the Festival since 2013. Doc. No. 32 ¶ 20. At some point in the last two years, she bought out her partner in NWF and became sole owner of the Festival. Id. ¶ 28. In other words, Bean was not simply one shareowner among many for NWF and the Festival; she essentially was the Festival. Cf. HipSaver, 984 N.E.2d at 766 (limiting recovery for defamation directed at a group to situations where the group is "so small

11

that the matter can reasonably be understood to refer to" the plaintiff or where circumstances "reasonably give rise to the conclusion that there is a particular reference" to the plaintiff (quotations omitted)). Given her ownership of and involvement in the Festival, it is reasonable to infer that the Festival could not be sold or otherwise undergo fundamental changes without Bean's approval. As detailed earlier, the Hashem statement could be understood as referring to such a change in the Festival, so it plausibly qualifies as of and concerning Bean. Plus, the Amended Complaint states that "<u>she</u> received a barrage of inquiries about the 'purchase'" in the wake of the press releases, Doc. No. 32 ¶ 65 (emphasis added), confirming that third parties thought the statement concerned Bean. Drawing all reasonable inferences in Bean's favor, it is entirely plausible that a person could read the Hashem statement and interpret it as referring to both NWF and Bean, as the owner and Executive Director of NWF. Therefore, both NWF's and Bean's commercial-disparagement claims may go forward at this stage. The motion to dismiss Count VII is DENIED.

    C.    <u>Count II: Chapter 93A</u>

The Amended Complaint states a claim for unfair or deceptive trade practices in violation of Massachusetts General Laws chapter 93A. Such a claim requires that "the defendant's actions fell within at least the penumbra of some common-law, statutory, or other established concept of unfairness or were immoral, unethical, oppressive, or unscrupulous." <u>Conformis, Inc. v. Aetna, Inc.</u>, 58 F.4th 517, 540 (1st Cir. 2023) (quotations omitted).

NWF's allegations of breach of contract do not support a Chapter 93A claim. "[T]o rise to the level of a [Chapter] 93A violation, a breach [of contract] must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party." <u>Zabin v. Picciotto</u>, 896 N.E.2d 937, 963 (Mass. App. Ct. 2008). Here, based on the ambiguity of the Agreement's term, <u>see</u> <u>supra</u> Section III.A, the breach alleged appears more a good-faith dispute

as to interpretation than a knowing violation to secure unbargained-for benefits. See Tactician Corp. v. Subway Int'l, Inc., No. 21-cv-10973, 2021 WL 5640695, at *12 (D. Mass. Dec. 1, 2021) (dismissing Chapter 93A claim where "the facts pled in the Verified Complaint illustrate nothing more than a reasonable disagreement arising from conflicting interpretations of a genuinely ambiguous contract").

NWF's commercial-disparagement allegations do support its Chapter 93A claim, though. "Defamatory statements are actionable under" Chapter 93A so long as those statements support a cause of action for defamation. Dulgarian v. Stone, 652 N.E.2d 603, 609 (Mass. 1995). Commercial disparagement is a species of defamation. HipSaver, 984 N.E.2d at 762 (analyzing commercial disparagement under the same elements as defamation). As NWF's commercial-disparagement claim survives, so too does its Chapter 93A claim. The motion to dismiss Count II is DENIED.

### D.   Count VI: Tortious Interference

NWF's claim for tortious interference with prospective economic advantage also suffices. To plead tortious interference, a plaintiff must allege that: (1) "a business relationship from which the plaintiff might benefit existed"; (2) "the defendant knew of the relationship"; (3) "the defendant intentionally interfered with the relationship for an improper purpose or by improper means"; and (4) "the plaintiff was damaged by that interference." Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 815 N.E.2d 241, 245 (Mass. 2004). As regards NWF, the Amended Complaint plausibly alleges facts supporting each of those elements.

First, NWF plausibly anticipated business relationships around its 2025 Festival. To satisfy this element, a plaintiff must allege "a probable future business relationship anticipating a reasonable expectancy of financial benefit." Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 48 (1st Cir. 2002). NWF alleges that it has "a history of conducting the Nantucket Wine

13

& Food Festival and [has] had agreements with several business partners and employees with a reasonable expectation of continuing the Nantucket Wine & Food Festival in 2025." Doc. No. 32 ¶ 136. True, NWF fails to specifically name a person or entity with which it expected to do business. But NWF has held its Festival annually since 1996, and the Amended Complaint alleges that the Festival uses "a variety of venues around the island" and draws over 4,000 attendees each year. Id. ¶ 19. These alleged past relationships form a reasonable foundation for a probable future business relationship. In this way, NWF has alleged more than "general competition for prospective customers in the same marketplace." Katin v. Nat'l Real Est. Info. Servs., Inc., No. 07-cv-10882, 2009 WL 929554, at *8 (D. Mass. Mar. 31, 2009). This is not a case of a new entrant to a market alleging inchoate relationships with prospective customers it has never before served. Cf. Laser Labs, Inc. v. ETL Testing Lab'ys, Inc., 29 F. Supp. 2d 21, 23–24 (D. Mass. 1998) (rejecting as too "inchoate" alleged relationships based on "[g]eneral inquiries in response to a mass mailing"). Nor is it one of an individual claiming interference with future job opportunities without alleging prior employment. Cf. Koppel v. Moses, No. 20-cv-11479, 2020 WL 6292871, at *8 (D. Mass. Oct. 27, 2020). And while, to ultimately succeed on its tortious interference claim, NWF must produce "evidence of a specific business relationship that was interfered with," Singh, 308 F.3d at 48, at this stage it suffices that NWF has plausibly alleged facts that support a reasonable inference of such a business relationship. This it has done with an alleged history of such relationships through years of holding the Festival in Nantucket.

Second, the Amended Complaint provides sufficient allegations to infer that White Elephant knew of NWF's prospective relationships. White Elephant has acted as the primary host venue for the Festival for the last ten years. Doc. No. 32 ¶ 19. Presumably, during that

14

tenure, White Elephant came to know some of the Festival's vendors and perhaps even some of its repeat attendees. Such knowledge would do for NWF's tortious-interference claim.

Third, NWF has pled that White Elephant used improper means to intentionally interfere with those relationships. The Massachusetts Supreme Judicial Court has suggested that this element requires that the "interference resulting in injury to another is wrongful by some measure beyond the fact of interference itself." United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 23 (Mass. 1990) (quotations omitted). This may be satisfied by threats, misrepresentations, defamation, or "other improper means in relation to either the existing contract or the prospective one." Id. at 24; see also Cutting Edge Homes, Inc. v. Mayer, 229 N.E.3d 613, 619 (Mass. App. Ct. 2024) (suggesting deceit, intentional misrepresentation, or dishonesty qualify as improper means). In this case, the Amended Complaint contains a plausible allegation of commercial disparagement, a species of defamation. That allegation suffices for the improper-means element of tortious interference.

Fourth, White Elephant's alleged interference plausibly resulted in damage to NWF. As discussed in Section III.B, supra, there are factual allegations sufficient to infer that the Hashem statement caused confusion among NWF's customers and vendors as to whether NWF's Festival continued to exist. That confusion plausibly contributed to "diverting constituents and business" to the Gordon Parties' Experience, which White Elephant has contracted to host. Doc. No. 32 ¶ 137. The requisite damage, then, consists of a diversion of customers and vendors away from NWF's Festivals due to confusion arising, in part, from the Hashem statement.

Even though NWF's claim for tortious interference survives, Bean's individual claim does not. Bean has not alleged any business relationships of her own with which White Elephant has interfered. Instead, the Amended Complaint alleges interference with the "constituents and

business" of the Festival.  Doc. No. 32 ¶ 137.  Bean owns and operates NWF, which runs the Festival, but the alleged relationships belong to the Festival and NWF, not Bean as an individual.  For that reason, Bean has failed to state a claim for tortious interference.  The motion to dismiss Count VI is DENIED as to NWF's tortious-interference claim but ALLOWED as to Bean's.

    E.    <u>Count VIII: Conspiracy</u>

The Amended Complaint fails to plausibly allege that White Elephant has engaged in a conspiracy.  There are two types of civil conspiracy under Massachusetts law: a "coercive type" and a "concerted-action" type.  <u>Aetna Cas. Sur. Co. v. P & B Autobody</u>, 43 F.3d 1546, 1563–64 (1st Cir. 1994).  The Court considers each in turn.

First, the allegations do not support a coercive-conspiracy claim.  This type of conspiracy requires that "defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently."  <u>Aetna</u>, 43 F.3d at 1563 (quotations omitted).  But the Amended Complaint does not plausibly allege any such power of coercion.  Plaintiffs cite the "gathering of confidential information through a lawyer," i.e., Goldberg, as the source of such power.  Doc. No. 46 at 18.  Even if that did suffice for a coercive conspiracy, the Amended Complaint contains no factual allegations that White Elephant even knew that Goldberg was acting, or had acted, as lawyer to both NWF and the Gordon Parties.  <u>See</u> Doc. No. 32 ¶¶ 159–75.

Second, the allegations fail with respect to a concerted-action conspiracy.  "For liability to attach on this basis, there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  <u>Aetna</u>, 43 F.3d at 1564.  Even absent an agreement, though, a concerted-action conspiracy may lie where the defendant "knows that . . . conduct [of another person] constitutes a breach of duty and gives substantial assistance or

encouragement to the other so to conduct himself." Thomas v. Harrington, 909 F.3d 483, 491 (1st Cir. 2018) (alteration in original) (quotations omitted). The Amended Complaint alleges that White Elephant and the Gordon Parties agreed to obtain Plaintiffs' proprietary information, misuse it to create the Experience, and then claim they had acquired the Festival in partnership with each other. Doc. No. 32 ¶ 145. But the factual allegations do not support this claim. As discussed above, there are no allegations that White Elephant engaged in or knew of the acquisition or misuse of proprietary information. Similarly, although White Elephant and the Gordon Parties announced a "partnership" to host the 2025 Experience, they did not claim to acquire the Festival in partnership. Id. ¶ 51 (stating that the Gordon Companies had "acquired ownership" of the Festival, without mentioning White Elephant). Finally, White Elephant's provision of one quote for the Gordon Companies' press release does not rise to the level of "substantial assistance" required for a finding of concerted action. Thomas, 909 F.3d at 491 (requiring "substantial assistance" to be a "substantial factor in causing the resulting tort"). Plaintiffs thus fail to state a claim for civil conspiracy against White Elephant. The motion to dismiss Count VIII is ALLOWED.

IV. CONCLUSION

For the foregoing reasons, defendant White Elephant's motion to dismiss, Doc. No. 34, is ALLOWED IN PART and DENIED IN PART. The motion is ALLOWED as to Bean's claim for tortious interference (Count VI) and Plaintiffs' claim for conspiracy (Count VIII). Otherwise, the motion is DENIED.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge