UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————
                                              )
THE NANTUCKET WINE &                          )
FOOD FESTIVAL, LLC, et al.,                   )
                                              )
        Plaintiffs,                           )
                                              )
v.                                            )        Civil No. 24-11640-LTS
                                              )
GORDON COMPANIES, INC., et al.,               )
                                              )
        Defendants.                           )
———————————————————)

MEMORANDUM & ORDER ON PENDING MOTIONS (DOC. NOS. 37, 72)

December 12, 2024

SOROKIN, J.

        People and companies have a right to compete.  But this case is not about fair

competition.  It is about a handful of false and misleading statements put out by defendants

Gordon Companies, Inc., and David Gordon (collectively, the "Gordon Parties") in an apparent

attempt to run plaintiffs The Nantucket Wine & Food Festival, LLC, ("NWF") and Nancy Bean

(collectively, "Plaintiffs") out of business.  And it is about the Gordon Parties' inability or

unwillingness to properly correct those statements.  For the reasons that follow, the Gordon

Parties' Motion to Strike, Doc. No. 72, is DENIED, and Plaintiffs' Motion for Preliminary

Injunction, Doc. No. 37, is ALLOWED IN PART and DENIED IN PART.[1]

---

[1] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing
system ("ECF"); pincites are to the page numbers in the ECF header.

I.    <u>BACKGROUND</u>

A.    <u>Facts</u>

1.    *The Nantucket Wine & Food Festival*

NWF runs an annual, multi-day event on Nantucket called the Nantucket Wine & Food Festival (the "Festival").  The Festival has been held annually—with the exception of a hiatus during the COVID-19 pandemic—since its founding as the Nantucket Wine Festival in 1997.  Doc. No. 40 ¶ 2.  In recent years, the Festival has taken place over the course of five days encompassing the weekend in May between Mother's Day and Memorial Day.  <u>Id.</u> ¶ 1.

The Festival consists of many events held at venues across the island of Nantucket each year.  NWF solicits "Luminaries," that is, experts and high-level presenters, as well as "Invitees"—other exhibitors, wineries, distributors, importers, and sponsors—to make up the content of the Festival each year.  The rest of the Festival attendees are "Guests," who either purchase tickets to the various events or are invited by, for example, a sponsor.  While the Festival occurs in May, NWF works on the Festival year-round, with ticket sales typically commencing in November.  Doc. No. 40 ¶ 20.

Nancy Bean became involved in the Festival in 2007, when her small events-and-marketing production company was hired to work on that year's edition.  Doc. No. 84-78 at 6.  Following that, until 2012, she acted as Director of Operations of the Festival.  <u>Id.</u>  In 2012, Bean and a partner purchased the rights to NWF and the Festival.  Doc. No. 84-94 at 11.  Since becoming an owner, Bean has expanded the Festival from its original focus on wine to include food as well, registering now-defunct state trademarks related to "Nantucket Wine & Food" in 2017.  Doc. No. 59-11 to -12.  Although NWF employs many people throughout the year, its permanent staff is limited to Bean and one other person, its current Director of Operations.  Doc. No. 84-78 at 11.

2

David Gordon entered the picture sometime in the fall of 2021. Doc. No. 10-1 ¶ 4. Gordon is the president and chief executive officer of the Gordon Companies, a regional liquor-and-wine retail-and-distribution business based in Waltham, Massachusetts. Doc. No. 84-15 at 10. Gordon, on behalf of the Gordon Companies, approached Bean about potentially investing in NWF. Doc. No. 10-1 ¶ 4. Their discussions continued over the course of about two years, during which time Gordon provided logistical, financial, and other assistance to Bean. Id. ¶ 5. Principally, Gordon furnished Bean with an attorney, defendant Todd Goldberg, who had previously done work for the Gordon Companies, to help Bean buy out her original partner. Doc. No. 84-15 at 163–64. Bean completed the buy-out in 2022, making her the majority owner of NWF, with a small percentage still owned by a third party. Id. The Gordon Companies also extended to NWF a loan of approximately $55,000. Doc. No. 84-15 at 32–33. In the process, Gordon gained access to financial and other sensitive information relating to NWF. Doc. No. 84-15 at 38–39.

Since 2014, the Festival has had as its primary host venue the White Elephant Hotel, a resort owned by White Elephant Hotel LLC, formerly a defendant to this action.[2] Doc. No. 84-94 at 127. NWF and White Elephant executed their 2024 Wine Festival Agreement (the "Agreement") on February 2. Doc. No. 40-7 at 1. This Agreement made White Elephant the exclusive "Host Hotel" of the 2024 Festival, scheduled for May 15 to May 19, id. § 1.4, and committed White Elephant to host NWF's Harbor Gala and various "Grand Tastings," id. § 4.1. However, the Agreement also reserved to NWF the exclusive rights to its name and logo. Id. § 3.1. Gordon, still assisting Bean, received a copy of this Agreement. Doc. No. 84-15 at 109.

---

[2] For ease of reference, the Court will lump the hotel and the LLC together, calling both "White Elephant."

As the 2024 Festival approached, Bean broke off negotiations regarding a Gordon Companies investment in NWF. Instead, Gordon and Bean executed a Mutual General Release and Release of Debt on behalf of the Gordon Companies and NWF, respectively, agreeing that NWF's $55,000 debt to the Gordon Companies would be paid off via sponsorship rights at the 2024 Festival. Id. at 32–34; Doc. No. 84-23.

Bean and NWF held their 2024 Festival from May 15 to May 19, as planned. The Festival apparently went smoothly, with no portent of what was to come, at least to Bean. Doc. No. 40 ¶ 8. In its aftermath, Bean posted on NWF's website a save-the-date for the 2025 Festival, marking the same weekend, May 14 to May 18, 2025. Id.[3] Similarly, on June 2, NWF posted to its official Instagram page a message about the 2024 Festival which ended with the note: "Can't wait to see you all bACK on the island in 2025."[4] Doc. No. 84-6. Within a month, however, that prospect would be put in doubt.

2. *The Challenged Statements*

On June 17, 2024—less than one month after the 2024 Festival ended—the Gordon Companies issued a series of four statements announcing the Gordon Companies' plans for the 2025 Nantucket Food and Wine Experience (the "Experience").[5] These statements form the heart of this case.

---

[3] The record does not establish on what date exactly this save-the-date was posted. According to Gordon, Bean did not send a save-the-date email until after he apprised her of his plans for a new event in 2025. Doc. No. 10-1 ¶ 8. Defendants have produced a copy of a save-the-date email sent from an NWF address to a Gordon Companies employee on June 14, 2024. Doc. No. 10-1 at 11. That copy suggests, but does not establish, that Bean did not earlier post or send a save-the-date. Regardless, what is important for present purposes is that the Gordon Parties received a save-the-date for the 2025 Festival prior to June 17, the date the Gordon Parties made the statements at issue in this case.

[4] The quote in the text is accurate. The "ACK" is an apparent reference to the airport code for Nantucket.

[5] The exact name of the Experience varied. In these initial statements, it was "Nantucket Food and Wine Experience" or "Nantucket Food & Wine Experience." At later dates, it became

a.    The Industry Email

The first statement took the form of an email announcement sent to "a cultivated list of industry professionals, including wine vendors, chefs and restaurant owners."  Doc. No. 10-1 ¶ 9. The Court will refer to this announcement as the "Industry Email."  As relevant here, the email stated:

> The Gordon Companies is thrilled to announce that we have partnered with White Elephant Resorts to present the newly branded Nantucket Food And Wine Experience.
>
> Under new guidance, this rebranded event will take place on Nantucket from Wednesday, May 14th through Sunday, May 18, 2025.
>
> This extraordinary celebration will offer a revitalized experience featuring the world's top vineyards, distilleries, and culinary minds.

Id. at 22–23.  The email included a hyperlink to the Experience's website, www.nantucketfoodandwine.com, and was signed by David Gordon as president of the Gordon Companies.  Id.

b.    The Customer Email

The second statement was another email, this one to the Gordon Companies' customer list.  Doc. No. 10-1 ¶ 9.  This message, which the Court will call the "Customer Email," bore the heading: "The Gordon Companies Purchases Nantucket Food and Wine Experience."  Id. at 18. The body of the email read, in relevant part, as follows:

> The Gordon Companies have partnered with the iconic White Elephant Resorts to present the newly branded Nantucket Food And Wine Experience.
>
> Under this new partnership, one of the nation's longest-running food and wine events will take place on Nantucket from Wednesday, May 14th through Sunday, May 18, 2025.

---

"Food & Wine Experience Nantucket."  For simplicity, the Court will use the term "Experience" as a catchall for these various names.

Id. at 19.  This email, too, included a hyperlink to the Experience website and the signature of David Gordon at the end.  Id.

   c. The Media Release

  The Gordon Companies also sent a press release to at least fifteen media outlets, including the Boston Globe, Boston Common Magazine, Wine Spectator, and Forbes.  Doc. No. 10-1 ¶ 9; Doc. No. 84-35.  The Court will call this message the "Media Release."  This release began with the heading: "The Gordon Companies Partner with The White Elephant to Present a Newly Branded Nantucket Food & Wine Experience."  Doc. No. 10-1 at 25.  Under that, a subheading read: "One of the nation's longest running food and wine events returns to Nantucket on May 14–18, 2025."  Id.  As to the body of the release, the relevant bits included:

> The Gordon Companies . . . and White Elephant Resorts are thrilled to announce their partnership for a newly branded Nantucket Food & Wine Experience in 2025.
>
>  . . . .
>
>  David Gordon, CEO of The Gordon Companies, notes, "We are excited to introduce the newly rebranded Nantucket Food & Wine Experience to the loyal guests who have enjoyed this celebratory time on the island for many years. The 2025 lineup reflects the excitement and innovations in the wine world, paired with some of the region's best culinary minds. The 2025 programming will be stimulating, diverse and fun for all guests to enjoy."
>
>  Khaled Hashem, President of White Elephant Resorts, adds, "We are honored that our harborside hotel will continue to serve as the official host for this dynamic partnership with The Gordon Companies. We look forward to carrying on the tradition of providing food and wine excellence for locals and visitors alike on beautiful Nantucket."

Id.  The release also included a hyperlink to the Experience's website.  Id.

   d. The Industry Release

  The Gordon Companies shared another press release with industry media outlets such as BevNet/Nosh, Wine Industry Advisor, Kane's Beverage News Daily, Beverage Dynamics, and Wine Business.  Doc. No. 10-1 ¶ 9.  The Court will call this the "Industry Release."  The

Industry Release ran with the heading: "Prominent New England Wine and Spirits Retailer Purchases Nantucket Food & Wine Experience." Id. at 28.  Its subheading was: "Gordon's Fine Wine Acquires Ownership Stake in One of the Nation's Longest-Running Food and Wine Events." Id.  And its body stated, in part:

> The Gordon Companies, owners of Massachusetts'[s] Gordon's Fine Wine and Baker's Best Catering, have acquired the ownership rights to the Nantucket Food & Wine Experience (previously known as the Nantucket Wine & Food Festival), one of the longest running food and wine events in the U.S.
>
> The rebranded event, in partnership with Nantucket's iconic White Elephant harborside hotel, will take place on the island from Wednesday, May 14 through Sunday, May 18, 2025, and will feature the world's top vineyards and culinary minds during wine dinners, seminars, galas, thematic receptions, wellness events, and celebratory brunches.
>
> "This longstanding event is an important part of Nantucket's rich history, not to mention a significant annual driver of tourism and local pride," says David Gordon, CEO of The Gordon Companies. "We're excited to introduce the newly rebranded Nantucket Food & Wine Experience, and we're especially honored to be one of the only fine wine and spirits retailers in the country to own and present a festival of this size and prominence."

Id.  As with the other statements, the Industry Release linked to the Experience's website at the bottom.  Id.

### 3.    *The Nantucket Food and Wine Experience*

These statements did not drop, fully formed, from the ether.  They were the result of a process set in motion even before the 2024 Festival.

As mentioned, David Gordon had been in negotiations with Bean for the Gordon Companies to invest in NWF and take over management of the Festival starting back in 2021. By the fall of 2023, though, Gordon had become "extremely frustrated" with Bean.  Doc. No. 84-15 at 68.  Believing that Bean would never bring him on as a co-owner as he had hoped, Gordon began to consider creating his own wine-and-food event on Nantucket.  Doc. No. 10-1 ¶ 5.

Aware of White Elephant's role in the Festival, Gordon reached out.  Doc. No. 84-15 at 67.  As luck would have it, around the same time, Khaled Hashem, president of White Elephant, had started to feel that White Elephant "could do better" with respect to the Festival, based on Bean's "organization and planning and time management."  Doc. No. 84-53 at 111–12, 115.  Around November 2023, Gordon and Hashem met to discuss forming their own event.  Id. at 16.  The two men then met four or five more times over the ensuing months leading up to May 2024.  Id. at 30.  At some point, Gordon also hired NWF's former Director of Operations, William Rohlfing, as Director of Fine Wine Operations for a subsidiary of the Gordon Companies.  Doc. No. 84-5; Doc. No. 84-15 at 60.

On April 26, Gordon contacted Malcolm Brooks, a web and graphic designer who owned several internet domain names related to Nantucket, food, and wine.  Doc. No. 84-20; Doc. No. 84-15 at 18.  Gordon initially inquired about Brooks doing design services for a subsidiary of the Gordon Companies.  Doc. No. 84-20.  Gordon and Brooks then met in person on Nantucket.  Id. at 3–4.  Gordon evidently shared his vision for a new event with Brooks because, in an email shortly after their meeting, Gordon asked Malcolm to sign an non-disclosure agreement, stating "this event we are planning is very confidential at this stage."  Id. at 4.  On April 30, Brooks told Gordon, via email, that he wanted to help with the "Food & Wine Festival," noting that "the current website" could be improved.  Id. at 1.  In response, Gordon looped in Rohlfing, then inquired about a domain name, nantucketfoodandwine.com, that Brooks owned.  Id.  When Brooks offered Gordon a list of domains including the word "festival" or "fest," Gordon replied, "[w]e need to use experience not festival (for now)."  Doc. No. 84-21.  Ultimately, Gordon purchased "nantucketfoodandwine.com" from Brooks.  Doc. No. 84-19.

The 2024 Festival came and went, as the Gordon Parties and White Elephant were busy planning their own event for 2025.  By June 7, the Gordon Parties had begun to work on the emails and press releases that would announce their new event—and ultimately trigger this lawsuit.  The Gordon Parties had engaged two public-relations consultants, Greg Cohen and Nicole Russo, to help craft those communications.  Doc. No. 84-15 at 81–82.  But emails show David Gordon was still closely involved in the process, acting as the primary contact for Cohen, Doc. No. 84-15 at 49, working with Hashem to get White Elephant's approval for the statements, Doc. No. 84-53 at 59, and generally monitoring and responding to emails about the statements, see generally Doc. Nos. 84-24 to -31, -61.

In his deposition in this case, David Gordon disputed his level of involvement in drafting these statements.  Doc. No. 84-15 at 44–45.  However, the Court finds that testimony not credible and concludes that Gordon did review and contribute to these statements.  For example, on June 7, Cohen emailed Gordon a document titled "Nantucket Food and Wine Experience DRAFT trade release."  Doc. No. 84-24.  That document appears to be a draft of the Industry Release.  It included the language about the Gordon Companies acquiring "the ownership rights to the Nantucket Food & Wine Experience (previously known as the Nantucket Wine & Food Festival), one of the longest running food and wine events in the U.S."  Id.  On June 11, Chelsea Bell, the Gordon Companies' Events and Marketing Director, shared with Gordon a Google Document titled "Nantucket Food and Wine Experience Draft Trade Release," along with the message, "[d]o you want to give this a-ok before I share it with Greg?"  Doc. No. 84-26.  From the similar titles, the Court infers this was another version of the document that Cohen had shared with Gordon.  Twelve minutes later, Bell emailed Cohen, with Gordon copied, "David had a few changes to the press release which I just attached below."  Doc. No. 84-25.  This

version of the document included some grammatical changes and new paragraphs about the

Gordon Companies.  Id.  It did not alter the reference to the Nantucket Wine & Food Festival,

though.  From all of this, the Court finds that Gordon reviewed the draft Industry Release,

suggested changes, shared it with Bell, and directed Bell to return the draft with his edits to

Cohen, all between June 7 and June 11.  The Court rejects the notion, on the present record, that

Gordon, a savvy entrepreneur building a new event while successfully managing his related

businesses, paid no attention to the framing of the promotion of this new venture, as he

seemingly contends.  The record is otherwise, as noted above and below.

On June 13, the Gordon Companies and White Elephant executed a three-year contract,

titled "Wine Festival 3 Year Agreement," under which White Elephant would act as the "Host

Hotel Sponsor" for the "Nantucket Food & Wine Experience" in 2025, 2026, and 2027.  Doc.

No. 84-38.  In almost all respects, this contract appears identical to the 2024 Agreement between

NWF and White Elephant.

The next day, June 14, Gordon sent an internal message to employees of the Gordon

Companies, stating, in part:

> I am pleased to announce that in partnership with White Elephant Resorts, we have
> acquired the rights to the Nantucket Wine Festival which will be rebranded as The
> Nantucket Food and Wine Experience. This event is one of the longest-running
> wine events in the country and is based out of Nantucket's iconic White Elephant
> Hotel.

Doc. No. 84-33.  As with the other statements, Gordon had been involved in drafting this

message ahead of time.  See Doc. No. 84-30.  For the same reasons as with the challenged

statements, then, the Court finds that Gordon knew, if not drafted, the contents of this message.

But June 14 is notable for another reason.  On that day, Gordon first revealed his plans to

Nancy Bean.  Over the phone, Gordon told Bean that his company had reached an agreement

with White Elephant and would be producing its own event in 2025.  Doc. No. 10-1 ¶ 7.  Later

that day, NWF sent a save-the-date email for its 2025 Festival to at least one employee of the

Gordon Companies.  Id. at 11.  Three days later, on the morning of June 17, the Gordon

Companies sent out the Industry Email, the Customer Email, the Media Release, and the Industry

Release.

### 4.    *Initial Response and Corrective Efforts*

In Plaintiffs' view, those four statements issued by the Gordon Parties imply that the

Gordon Companies had purchased the rights to the Festival, that the Gordon Parties' Experience

was a re-branded version of Plaintiffs' Festival, and that no other version of the Festival would

be taking place in 2025.  The issue, Plaintiffs assert, is that no such purchase occurred, the

Experience bore no relation to the Festival, and Plaintiffs very much intended to run the Festival

in 2025.

The statements quickly gained traction.  At 8:25 a.m. on June 17, BevNet posted the

Industry Release.  Doc. No. 84-51.  At 10:17 a.m., Cohen emailed Gordon, Bell, and Russo to let

them know of the BevNet post, saying he "[e]xpected pick-up later today too from Park Street

Insider Daily News email newsletter."  Doc. No. 84-35.  Russo followed up with a list of

publications to which she sent the Media Release.  Id.  Gordon responded with successive

messages of: "Amazing!  Thank you Greg!" and "And thank you Nicole!"  Doc. No. 84-34.  At

4:45 p.m. that day, though, Gordon emailed Cohen, "[t]he subject of our email that went out said

Purchases Nantucket Food and Wine, if we can I'd like to stick with 'The Gordon Companies

Partner with The White Elephant to Present a Newly Branded Nantucket Food & Wine

Experience."  Doc. No. 88-1.  Gordon also testified that, at some point that day, he had a phone

conversation with Cohen, instructing Cohen to retract the earlier press releases.  Doc. No. 84-15

at 99–101.

11

The Gordon Companies' emails reached Bean that day.  Around midday, her Director of Operations forwarded her a copy of the Gordon Companies' Customer Email.  Doc. No. 84-93. Bean forwarded the email to a wine-industry insider, who responded by asking, "[i]s there any discussion with this guy that is ongoing for you?"  Id.  Bean replied that she did not have a deal with Gordon and also wrote, "I am inundated with texts and calls—everyone thinks I sold NWF to him for $$$$$$$."  Id.  According to Bean's deposition testimony, NWF also received "frantic inquiries from Boston Common Magazine regarding the sale and their astonishment of it given they had just been with us on-site and were in the midst of writing all of our post-festival acclaims and reviews and pieces."  Doc. No. 84-79 at 39–40.

On June 18, the Gordon Companies sent out a clarification to its Industry Email, and Greg Cohen began contacting industry publications to remove from the Industry Release the statement that the Experience had been "previously known as the Nantucket Wine & Food Festival."  See supra Sections I.A.4.b, I.A.4.d.  At that point, the Gordon Companies did not send out corrective emails to the other recipients of the statements or correct Gordon's internal email.

Still, over the next couple of days, those in the industry began to react to the initial emails and press releases.  On June 18, a vineyard export manager sent Gordon her congratulations: "I saw the yesterday's [sic] press release about the Nantucket wine festival.  Again, all my congratulations!"  Doc. No. 84-37.  That same day, Ernest Gallo of Gallo Wines—"a prominent person in the wine industry," according to Gordon, Doc. No. 84-15 at 122—emailed Gordon, "[c]ongratulations to your purchase of the Nantucket Food and Wine Festival."  Doc. No. 84-40. A day later—after Gordon had instructed Cohen not to use the term "purchase," and after the Gordon Companies had sent its correction to the Industry Email—Gordon wrote back to Gallo, saying: "Thank you Ernest! We're getting there, one step at a time!"  Id.  His response contained

12

no correction or disavowal of Gallo's express understanding that Gordon Companies had

"purchase[d]" the Festival.    Similarly, on June 19, a friend of Gordon named Judson Samuels

emailed Gordon a link to a news story titled, "The Nantucket Wine & Food Festival will now be

known as the Nantucket Food and Wine Experience, following its recent acquisition by the

Gordon Companies."  Doc. No. 84-41.  Samuels asked, "David, is this your org who is now

running the Nantucket Wine Feaival [sic]?"  Id.  Gordon's response: "That is us! Going to be an

incredible event next year!"  Id.

The Gordon Companies' announcements also had an effect within the Town of

Nantucket's government.  Back on June 13, David Gordon had reached out to Amy Baxter,

Licensing Administrator at the Nantucket Police Department.  Doc. No. 84-8.  Although Baxter

does not herself approve event permits—the Town's Select Board seems to have that power—

she appears to be an important contact for anyone hoping to obtain a permit for an event such as

the Festival.  Gordon's June 13 email to Baxter read, "I have been working with the White

Elephant on a new culinary and wine event and would like to introduce myself via phone when

you have sometime [sic]."  Id.  On June 17, the NWF-director-turned-Gordon-Companies-

employee William Rohlfing forwarded to Baxter a copy of a Gordon Companies press release,

with Gordon copied.  Doc. No. 84-46.  Baxter met with Gordon and Rohlfing that day and

subsequently emailed a third party about "a change in ownership and management of the Wine

Fest."  Doc. No. 84-11.  On June 19, Baxter told Gordon and Rohlfing of inquiries from local

media regarding the "competing festivals," and stated, "[j]ust to confirm I should not be

expecting Nancy to come at us to try and secure that weekend since you have a contract with

White Elephant correct?  I know that to be the case and I will be general in my answer but just

reconfirming."  Doc. No. 84-46.  Twenty minutes later, Baxter told a reporter from a local

newspaper, "I do not anticipate competing festivals." Doc. No. 84-47. Baxter then forwarded this email to Rohlfing and Gordon. Id.

In the wake of the June 17 statements, Bean and NWF began to take legal action. On June 18, their attorney sent a letter to Khaled Hashem, White Elephant president, seeking information about the press releases and White Elephant's role in them. Doc. No. 84-45. On June 19, Bean and NWF, through their attorney, sent the Gordon Parties a cease-and-desist letter, which clarified that "there was no purchase" of the festival and demanded a retraction of any communications implying as much. Doc. No. 84-43 (emphasis in original).

Presumably in response to the former letter, Hashem emailed Gordon on June 20, asking to see the press releases sent out by the Gordon Parties. Doc. No. 84-44. In response, Gordon forwarded one of the releases and wrote, "[t]here was a wine industry wire that went out that read horribly and I am dealing with the BS surrounding it, the PR person was trying to 'sell' it and used wrong language." Id. By that point, the Gordon Parties had entered damage-control mode.

a.    Corrections to the Industry Email

On June 18, the Gordon Parties issued their first correction. The correction, sent to the same recipients as the original Industry Email, took the form of a message from David Gordon, stating:

> I'd like to make a clarification to our last email. Gordons has not purchased any festival. We have partnered with the White Elephant in a multiyear deal to produce a new event. In no way are we affiliated with any other event or festival on Nantucket. Sorry for any confusion this may have caused.

Doc. No. 10-1 at 29–31. The Gordon Companies followed up, on June 21, with a message to the same industry insiders that matched the correction it sent to customers, which is excerpted below. Id. at 46–48.

b.    Corrections to the Customer Email

On June 20, the Gordon Companies issued a correction to its customer list.  The

correction, appearing in small print above an email advertisement for the Gordon Companies,

read:

> A Correction From Monday's Email Announcement: The Gordon Companies have
> partnered with White Elephant Resorts in a deal to produce a new event titled the
> Nantucket Food and Wine Experience. Gordon's has not purchased, acquired, or
> rebranded the previously existing Nantucket Food & Wine Festival which has been
> operated by a still operating entity which is not affiliated with The Gordon
> Companies in any way. The Nantucket Food and Wine Experience is also not
> affiliated with the Nantucket Food & Wine Festival. Rather, this is the first of what
> we know will be an annual new food and wine experience the likes of which has
> never been seen on Nantucket before. Learn more & receive updates by visiting
> nantucketfoodandwine.com!

Doc. No. 10-1 at 37–41.  The Gordon Companies included similar messages, with similar

placement, in other emails to customers that day.  Id. at 42–45.

c.    Corrections to the Media Release

The Gordon Parties never sent any corrective messages to the recipients of its Media

Release.  In his deposition, Gordon testified, "I am not aware of any news articles or stories

concerning the Gordon Parties' event announcement published by the local media outlets that

received the [Media] Release."  Doc. No. 10-1 ¶ 17.

d.    Corrections to the Industry Release

According to an affidavit submitted by David Gordon, on June 19, 2024, he:

> directed the Gordon Parties' internal marketing department to contact the five
> industry publications which had published stories based on the [Industry] Release
> to request that they remove the statement in their coverage of the announcement
> that incorrectly stated the Nantucket Food and Wine Experience event was
> "previously known as the Nantucket Wine & Food Festival" from their online
> publications.

Doc. No. 10-1 ¶ 12.  The affidavit also claims that the Gordon Parties sent a "correction notice" to those recipients of the Industry Release that had not published stories about the Experience. Id. ¶ 21.  The record shows that Greg Cohen did get several industry publications to correct the versions of the Industry Release that they had published by removing the parenthetical stating that the Experience was "previously known as the Nantucket Wine & Food Festival."  Doc. No. 88-4.

5.  *The Aftermath*

In the months following the Gordon Parties' statements, Plaintiffs engaged in efforts to assure potential Luminaries, Invitees, and Guests that the Festival had not been sold.  In response to questions from several chefs regarding whether a sale had happened, Bean emailed all chefs who had participated in the 2024 Festival clarifying the situation and asking for their support. Doc. No. 84-89; Doc. No. 84-78 at 88.  Bean sent similar emails to sommeliers, Doc. No. 84-91, wine importers, Doc. No. 84-90, and other constituents, Doc. No. 88-5.  The Boston Globe, the Newport Buzz, and the Nantucket Current all ran articles about the Festival and the Experience with quotes by Bean.  Doc. Nos. 59-1 to -3.  Bean also circulated a petition to "keep Nantucket Wine Fest local."  Doc. Nos. 88-12 to -13.  In response to these efforts, Bean received messages of support from many Nantucket locals and industry insiders.  See, e.g., Doc. Nos. 88-5, -8 to -11.  Still, according to Bean, "many people remain under the impression that I either tried to sell the genuine festival or will sell the genuine festival" because they "find it hard to believe someone would lie so blatantly about purchasing a company unless there had been some agreement that I reneged or that belatedly fell apart."  Doc. No. 40 ¶ 18.

On September 25, the Gordon Parties and White Elephant submitted applications to the Nantucket Select Board for three events to take place at White Elephant as part of the 2025 Experience.  Doc. No. 88-15.  Two days later, Licensing Administrator Amy Baxter sent a

message to the Gordon Parties, White Elephant, and Plaintiffs, stating that her office had received the applications from the Gordon Parties and White Elephant, as well as an event proposal from NWF.  Id.  The message further outlined that the Select Board would consider each application on its own merits, and that tickets for these events should not be sold in the meantime.  Id.  A week later, counsel for the Nantucket Select Board told Plaintiffs' counsel that the decision would likely not come until after this Court ruled on the Plaintiffs' Motion for Preliminary Injunction.  Doc. No. 84-10.  That week, NWF submitted to the Select Board five applications for event permits.  Doc. No. 84-94 at 130–31.  As far as the Court is aware, NWF's applications remain pending.

     B.   <u>Procedural Posture</u>

Plaintiffs initiated this action on June 26, naming as defendants the Gordon Companies, David Gordon, and White Elephant.  Doc. No. 1.  Plaintiffs later amended their complaint to add a legal malpractice claim against Todd Goldberg.  Doc. No. 32.  On July 16, Plaintiffs filed an Emergency Motion for Expedited Discovery, Doc. No. 5, which the Court denied on August 1, Doc. No. 26.

Plaintiffs filed their Motion for Preliminary Injunction on September 3.  Doc. No. 37. Originally, the motion sought to enjoin the Gordon Parties and White Elephant from making additional statements about the purchase of NWF, conducting a wine-and-food event on Nantucket on the same days as the Festival, and using marks or names similar to NWF's.  Id. at 1–2.  The Court allowed the parties to engage in expedited discovery limited to topics identified by the parties and related to the preliminary-injunction motion.  Doc. Nos. 50, 54.

The situation changed substantially just before and at this Court's hearing on the motion. On November 6, Plaintiffs agreed to dismiss their claims against White Elephant.  Doc. No. 89-1.  In exchange, White Elephant agreed that it would "not contract or in any way conduct an

event with, and [would] prevent its affiliates from contracting or conducting an event with, Gordon Event Services LLC, Gordon Companies, Inc., or any of their affiliates for any event in May 2025 or May 2026." Id.  In addition, counsel for the Gordon Parties represented, both to Plaintiffs and to the Court, that they were in the process of withdrawing the permit applications they had filed to the Nantucket Select Board.  Doc. No. 89.  Indeed, it seems the Gordon Parties no longer plan on holding the Experience in 2025, at least not on Nantucket.

In light of these changes, Plaintiffs filed a Proposed Preliminary Injunction Order, which significantly narrowed the scope of relief sought.  Plaintiffs now bring three requests:

1. Defendants Gordon Companies, Inc., and David Gordon shall not make or cause others to make false disparaging statements about either of the Plaintiffs, the ownership of the Nantucket Wine & Food Festival, or its operations.

2. Defendants Gordon Companies, Inc., and David Gordon shall make corrective disclosures over the same forms of press releases and emails by which they falsely announced that they "acquired" Plaintiffs' festival, "rebranded" it, would "continue" the "long-running" event, or that their festival was "previously known as" the Nantucket Wine & Food Festival, namely the following corrective disclosure to each and every recipient of the false announcements and messages:

Pursuant to an Order of the Court dated November 18, 2024, the Gordon Companies hereby discloses that, in June of this year, the Gordon Companies sent out false press releases and emails stating that Gordon Companies had acquired and rebranded the Nantucket Wine & Food Festival under new management. There was never any acquisition, rebranding, or new management of the Nantucket Wine & Food Festival. The Gordon Companies is not planning any festival for May 2025. The long-running Nantucket Wine & Food Festival continues to operate. As previously announced by the Nantucket Wine & Food Festival, the annual tradition will continue May 14 – 18, 2025, under the leadership of its longtime Executive Director Nancy Bean. For more information, please visit www.nantucketwinefestival.com.

3. Defendants shall post the same corrective disclosure in large bold font on the home page of the website at nantucketfoodandwine.com and foodandwinenantucket.com, with no other text or links on the page, but with the reference to www.nantucketwinefestival.com at the end of the disclosure hyperlinked to the website at that domain name.

Doc. No. 91-1.  The Court will refer to these three requests as, respectively, the "false-statements request," the "corrective-disclosures request," and the "website request."

On November 18, the Court held a hearing on Plaintiffs' motion.  Afterward, Plaintiffs submitted a Notice of Supplemental Authority, Doc. No. 95, and the Gordon Parties responded with a Counter Notice of Supplemental Authority, Doc. No. 96.  Having considered all of this, the Court resolves a threshold matter before proceeding to the preliminary-injunction determination.

## II.    MOTION TO STRIKE

The Gordon Parties move to strike the Declaration of Michael Fahey (the "Fahey Declaration"), Doc. No. 64, which Plaintiffs submitted in support of their Motion for Preliminary Injunction.  Doc. No. 72.  After the Gordon Parties and White Elephant opposed Plaintiffs' preliminary-injunction motion, Plaintiffs sought, with the assent of those parties, leave of the Court to submit a combined reply brief in excess of this Session's normal page limit for replies. Doc. No. 61.  With that request, Plaintiffs attached not only their proposed reply brief but also the Fahey Declaration.  Doc. No. 61-1.  Fahey, a public-relations consultant, explained that he had been hired by Plaintiffs to, in relevant part, conduct "a survey of samples of petition signatories" to determine the amount of confusion caused by the challenged statements.  Id. ¶ 3. Fahey sent the survey to 263 signatories of the "Keep Nantucket Wine Fest Local" petition, of whom sixty-five responded, with sixty-two indicating that "they had attended one or more Food and Wine Nantucket events, even though no event named that has yet taken place."  Id. ¶ 6.  The declaration concluded, "[i]n my professional opinion, this overwhelming majority of respondents . . . have displayed confusion from the similarity of the name Nantucket Wine & Food Festival and the name Food and Wine Nantucket."  Id.  The declaration also included as exhibits screenshots of the petition and the survey results.  Doc. No. 61-1 at 16–21.  The Court granted

Plaintiffs' requested leave, Doc. No. 62, and Plaintiffs filed their reply brief and the Fahey Declaration, Doc. Nos. 63, 64.

The Gordon Parties have moved to strike the Fahey Declaration, asserting many reasons to support their motion. The Court finds none of their reasons compelling. First, contrary to the Gordon Parties' assertion, Plaintiffs had leave of the Court to file the Fahey Declaration. Plaintiffs attached the Fahey Declaration to their assented-to motion for leave to file their reply brief, and the Court granted that motion. Second, although the Gordon Parties deconstruct Fahey's qualifications as an expert witness, Plaintiffs have not proffered Fahey as an expert witness. Fahey's declaration sets out facts he personally perceived. See Fed. R. Evid. 701 (allowing a non-expert witness to testify to facts "rationally based on the witness's perception"). Third, to the extent Fahey has offered expert testimony, the Fahey Declaration is not subject, at this stage, to the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2). See Fed. R. Civ. P. 26(a)(2)(D) (establishing timing for expert disclosures absent court order). Nor must it meet the qualification requirements of Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See Asseo v. Pan Am. Grain Co., 805 F.2d 23, 25–26 (1st Cir. 1986) (holding that courts may rely on otherwise inadmissible evidence in ruling on a motion for a preliminary injunction). Fourth, despite the Gordon Parties' protests, the information contained in the Fahey Declaration is relevant to the presence or lack of ongoing harm from the Gordon Parties' actions.

Ultimately, most of the Gordon Parties' arguments go to the weight to be given to the Fahey Declaration rather than to its propriety. The Motion to Strike, Doc. No. 72, is DENIED.

III.    MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs' Motion for a Preliminary Injunction seeks three forms of relief: the false-statement request, the corrective-disclosures request, and the website request. "To grant a

preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Id. (quotations omitted). Because Plaintiffs have carried their burden with respect to the corrective-disclosures request and the website request—but not the false-statement request—their Motion for Preliminary Injunction, Doc. No. 37, is ALLOWED IN PART and DENIED WITHOUT PREJUDICE IN PART.

     A.    Likelihood of Success on the Merits

     Plaintiffs ground their current request in their claims for False Advertising under § 43(a) of the Lanham Act (Count I) and Unfair and Deceptive Trade Practices under Massachusetts General Laws Chapter 93A (Count II). Because the Court finds preliminary injunctive relief warranted by Plaintiffs' Chapter 93A claim, it need not discuss their Lanham Act claim.

     Chapter 93A grants a private right of action to any business harmed by another business's "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a); see also id., § 11. This covers defamation, Dulgarian v. Stone, 652 N.E.2d 603, 609 (Mass. 1995), of which commercial disparagement is a species, HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013). In other words, Plaintiffs can prevail on their Chapter 93A claim if they can establish that they were harmed by the Gordon Parties' commercial disparagement.

Under Massachusetts law, the elements of commercial disparagement require a plaintiff to prove that a defendant:

> (1) published a false statement to a person other than the plaintiff; (2) "of and concerning" the plaintiff's products or services; (3) with knowledge of the statement's falsity or with reckless disregard of its truth or falsity; (4) where pecuniary harm to the plaintiff's interests was intended or foreseeable; and (5) such publication resulted in special damages in the form of pecuniary loss.

HipSaver, 984 N.E.2d at 763.  Considering each of these elements in turn, the Court finds that Plaintiffs are likely to succeed on their Chapter 93A claim on a theory of commercial disparagement.

### 1.    *Publishing of a False Statement*

Plaintiffs can likely show that the Gordon Parties published false statements.  Each of the four challenged statements were sent on behalf of the Gordon Companies, and David Gordon was heavily involved in the drafting of these statements, appending his signature to the Industry Email and Customer Email.  Because each of the four challenged statements was emailed or otherwise shared with a large number of people or entities—and, thus, plainly published, Phelan v. May Dep't Stores Co., 819 N.E.2d 550, 554 (Mass. 2004)—the real issue on this element is the alleged falsity of those statements.  "[T]o be actionable, a statement must be materially false," setting aside "minor inaccuracies," such that "it would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  Kilnapp Enters., Inc. v. Mass. State Auto. Dealers Ass'n, 47 N.E.3d 31, 38 (Mass. Ct. App. 2016) (quotations omitted).  Three of the challenged statements—the Customer Email, the Media Release, and the Industry Release—were likely false.  The Court therefore need not address the Industry Email.

The Customer Email was false because it implied that the Gordon Companies had purchased the Festival and was rebranding it as the Experience.  The email included the heading, "The Gordon Companies Purchases Nantucket Food and Wine Experience," then referred to the

Experience as "one of the nation's longest-running food and wine events," which would take place on Nantucket on the dates usually used by the Festival.  Doc. No. 10-1 at 18.  Because the Festival was a long-running food and wine event that took place in Nantucket on those dates, the reader would understand this message to mean that what the Gordon Companies had purchased was the Festival.  As David Gordon admitted in his deposition, the Gordon Companies had not acquired ownership of the Festival, and it was inaccurate to call the new Experience "one of the nation's longest-running food and wine events."  Doc. No. 84-15 at 123.  Therefore, the Customer Email likely constituted a false statement.

Plaintiffs are likely to prove the Media Release false for similar reasons.  This release referred to the "newly branded Nantucket Food & Wine Experience" and stated that "[o]ne of the nation's longest running food and wine events returns to Nantucket on May 14–18, 2025."  Doc. No. 10-1 at 25.  As with the Customer Email's implied purchase, this language (especially the use of the word "returns") would lead a reader to believe that the Gordon Companies were rebranding the Festival as the Experience.  Indeed, Gordon recognized in his deposition that calling the Experience a "rebranded event" was inaccurate.  Doc. No. 84-15 at 123–24.

Plaintiffs' strongest case as to falsity lies with the Industry Release.  That release outright stated that the Gordon Companies had "acquired the ownership rights to the Nantucket Food & Wine Experience (previously known as the Nantucket Wine & Food Festival), one of the longest running food and wine events in the U.S."  Doc. No. 10-1 at 28.  Gordon conceded, correctly, in his deposition that this release contained four inaccuracies: (1) that the Gordon Companies had acquired an ownership stake in one of the nation's longest-running food and wine events; (2) that the Gordon Companies had acquired ownership of the Festival; (3) that the Experience was a long-running event; and (4) that the Experience was "rebranded."  Doc. No. 84-15 at 53–54,

123–24.  Given these inaccuracies, Plaintiffs are likely to succeed in showing that the Gordon Parties published false statements.

2.    <em>Of and Concerning Plaintiff</em>

Plaintiffs will also likely prevail on the second element of commercial disparagement. This element is met if either: (1) "the defendant intended the words to refer to the plaintiff and . . . they were so understood"; or (2) "persons could reasonably interpret the defendant's words to refer to the plaintiff and . . . the defendant was negligent in publishing them in such a way that they could be so understood." <u>HipSaver</u>, 984 N.E.2d at 766 (quotations omitted).  The Customer Email and the Media Release can both meet, at the very least, the second prong.  The location, the dates, and the reference to "one of the nation's longest-running food and wine events" combine such that a reasonable person would understand each statement as referring to Plaintiff's Festival.  Many people did so understand it.  As noted above, a wine-industry insider asked about negotiations after viewing the Customer Email, Doc. No. 84-93, and Boston Common Magazine, having received the Media Release, sent NWF "frantic inquiries" regarding the sale, Doc. No. 84-79 at 39–40.  Moreover, the Gordon Parties were negligent—or worse—in creating that impression.  The Gordon Parties were familiar with Plaintiffs' Festival's location, dates, and history.  David Gordon should have known the difference between the Experience and the Festival.  He spoke to Bean about the Experience and a Gordon Companies employee received a save-the-date for the 2025 Festival only three days before the Gordon Parties issued these statements.  For these reasons, the Customer Email and Media Release were of and concerning Plaintiffs' Festival.

The case for the Industry Release is even clearer.  Because the Industry Release refers to the Festival by name, it satisfies the of-and-concerning element without resort to the above test. <u>HipSaver</u>, 984 N.E.2d at 766 (requiring extrinsic proof that a third party understood the

24

statement to refer to the plaintiff only "if the person is not referred to by name"). Thus, Plaintiffs have a high likelihood of meeting this requirement for the Customer Email, the Media Release, and the Industry Release.

### 3.    Knowledge of Falsity or Reckless Disregard as to Truth

Similarly, Plaintiffs likely will be able to show that the Gordon Parties issued the challenged statements with at least reckless disregard as to the truth or falsity of those statements. This element requires only that there be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." HipSaver, 984 N.E.2d at 768. Here, the Gordon Parties almost certainly knew their statements about purchasing Plaintiffs' Festival, taking over a long-running event, and rebranding the Experience were inaccurate. David Gordon had viewed NWF's 2024 Agreement with White Elephant, in which NWF expressly reserved the rights to the Festival's name and logo. Gordon could not then have believed that the Gordon Companies were acquiring any rights to NWF by contracting with White Elephant for the Experience. Indeed, Gordon told Malcolm Brooks in April 2024 that he needed to use "experience" rather than "festival," indicating an understanding that the Gordon Parties' new event would be separate from Plaintiffs'. Next, Gordon emailed his entire staff stating Gordon Companies had "acquired" the Festival, yet he knew then and now that this statement was not true based on his long-before-aborted discussions with Bean. Finally, by June 14, when the NWF save-the-date email arrived, the Gordon Companies had notice that Plaintiffs intended to hold their Festival in 2025 under its original branding. All this suggests that the Gordon Parties not only had reason to doubt the veracity of their statements but that they did so doubt it.

4. *Harm Intended or Foreseeable*

Plaintiffs have presented sufficient evidence on the element of intent or foreseeability at this stage, as well.  This element requires proof that a defendant "intends for publication of the statement to result in harm to [the] interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so."  HipSaver, 984 N.E.2d at 770.  Stating that a competitor no longer operates independently could foreseeably cause that competitor to lose business.  Here, the Gordon Parties' statement told their customers, local and national media, and industry groups that Plaintiffs' event no longer existed independent from the Gordon Parties' Experience.  David Gordon's post-statement conduct suggests that this was intentional.  Gordon continued to support the impression that the Gordon Parties had acquired the Festival even after he had begun attempting to correct the challenged statements.  He corrected neither Gallo nor Samuels when they congratulated him on the purchase, even though he had already told the public-relations consultant Cohen not to use the term "purchase," and even though the Gordon Companies had already sent a correction to its Industry Email by that point.  That is enough, at this stage, to find a likelihood of success on this element.

5. *Special Damages*

Finally, Plaintiffs can also likely show special damages.  "[W]here a false statement has been 'widely disseminated,' and it would be impossible to identify particular customers who chose not to purchase a plaintiff's goods or services," a plaintiff may satisfy this element "by circumstantial evidence showing that the loss [of the market] has in fact occurred, and eliminating other causes."  HipSaver, 984 N.E.2d at 772–73 (quotations omitted) (alterations in original).

Here, the dissemination of these statements to the Gordon Companies' customers, to fifteen media outlets, and to a number of industry publications likely puts this case in "widely

disseminated" territory.  Plaintiffs also likely have enough circumstantial evidence to show pecuniary loss.  They have emails—and testimony from Bean regarding non-email communications—showing confusion among prior Luminaries, Invitees, and Guests as to the Festival's continued existence.  This evidence likely represents only the tip of the iceberg.  Although tickets to the 2025 Festival were not on sale when the Gordon Parties issued their statements, the resultant confusion will still likely cause a loss of sales when tickets do become available.  More notably, the Gordon Parties' statements seem to have caused enough confusion among the Nantucket town government that the Select Board has delayed deciding on NWF's permit applications.  This prevented Plaintiffs from selling tickets to the 2025 Festival starting in November, as they normally would, and thus has likely caused a pecuniary loss to Plaintiffs.  On a motion for preliminary-injunctive relief, that is all that is required.  Having already found that Plaintiffs have enough on the other elements of their Chapter 93A claim on a commercial-disparagement theory, the Court concludes that Plaintiffs have established a likelihood of success on the merits sufficient for the present motion.

    B.   <u>Irreparable Harm</u>

Plaintiffs have also shown a likelihood that irreparable harm will result if the Court does not issue preliminary injunctive relief.  This prong does not require that "the denial of injunctive relief will be fatal to [a plaintiff's] business," but only that "the plaintiff shows that its legal remedies are inadequate."  <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 18–19 (1st Cir. 1996).  Thus, irreparable harm may obtain "[i]f the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages."  <u>Id.</u>  At this stage, courts use a sliding-scale approach between likelihood of success on the merits and likelihood of irreparable harm, such that "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown."  <u>Braintree Labs., Inc. v.</u>

Citigroup Glob. Mkts. Inc., 622 F.3d 36, 43 (1st Cir. 2010) (citations omitted) (alteration in original).

Here, Plaintiffs have shown likely harm to their goodwill and reputation which would be irreparable absent additional corrective disclosures.  "By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages.  Accordingly, this kind of harm is often held to be irreparable."  Ross-Simons of Warwick, 102 F.3d at 20.  According to Bean's uncontradicted affidavit, the people with whom she deals find it hard to believe that another business would so blatantly lie about a purchase, and so they mistrust Bean.  Doc. No. 40 ¶ 18.  And, once tickets do go on sale, Plaintiffs are likely to lose sales (and participating vendors) due to the confusion created by the Gordon Parties' statements.  See Spruce Env't Techs., Inc. v. Festa Radon Techs., Co., No. Civ. 15-11521, 2015 WL 4038802, at *5 (D. Mass. July 2, 2015) ("Although plaintiff can be compensated for the most part by money damages if it prevails on the merits of its [false advertising] claims, the Court concludes that plaintiff has demonstrated a modicum of irreparable harm to its goodwill and reputation.").

The Gordon Parties' corrective efforts have been inadequate.  They sent corrections to their Customer Email, but these corrections did not admit or explain the falsity of the original statement.  Cf. Riverdale Mills Corp. v. Cavatorta N. Am., Inc., 146 F. Supp. 3d 356, 363 (D. Mass. 2015) ("Defendants have taken accountability for their mistake and have corrected it, and the status quo has returned without the need for injunctive relief.").  Instead, they merely stated that "Gordon's has not purchased, acquired, or rebranded the previously existing Nantucket Food & Wine Festival which has been operated by a still operating entity which is not affiliated with The Gordon Companies in any way."  Doc. No. 10-1 at 37–41.  This obfuscatory language could lead the reader to believe that the Festival no longer existed.  Additionally, while the original

Customer Email went out as its own message, the corrections went out in small print above ads for the Gordon Companies. This diminishes the likelihood that the corrections would be noticed by as many recipients, even if they did go to the same addresses as the Customer Email.

As for the Media Release, David Gordon admitted that the Gordon Parties sent no correction to the recipient media outlets. Those outlets may not have published any articles based on the Media Release, but Bean's uncontradicted deposition testimony shows that at least one outlet—Boston Common Magazine—received and reacted to it.

The Court does not have a copy of any correction sent to the recipients of the Industry Release. An affidavit submitted by Gordon claims that he directed his employees to request retractions from or send correction notices to those recipients. This hands-off approach stands in stark contrast to Gordon's involved role in the drafting of the challenged statements. And without copies of the correction notices, the Court cannot determine their efficacy.

In any event, the Court finds that the confusion created by the Gordon Parties' statements will continue to harm Plaintiffs without judicial intervention. The Gordon Parties argue that any confusion they caused has dissipated. However, they point primarily to the corrective efforts undertaken by Plaintiffs. It is true that, in response to the Gordon Parties' statements, Plaintiffs went to great lengths to set the record straight. And many people, having been informed of the distinction between the Experience and the Festival, expressed their firm support for the latter. However, just because some locals and insiders now know that the Gordon Parties did not purchase the Festival, that does not mean that all confusion has dissipated. Many Festival devotees may still find it difficult to trust Bean, as she has avowed. Other, more casual participants may not be so plugged in and so may, having seen one of the Gordon Parties' statements, still believe the Festival is no more. Spruce Env't Techs., 2015 WL 4038802, at *5

(finding irreparable harm where one customer had been affected by defendant's false advertising).  It is not hard to see that, absent more rigorous corrective efforts by the Gordon Parties, Plaintiffs may continue to lose goodwill, their positive reputation, and new ticket sales.

On the other hand, Plaintiffs have failed to show any irreparable harm will result absent the granting of their false-statement request.  Questioned by the Court at the motion hearing, counsel for Plaintiffs could not identify any actionable, false statements about Plaintiffs made by the Gordon Parties after July 1.  Counsel did point to a then-upcoming article in Boston Magazine about the dispute between Plaintiffs and the Gordon Parties which was to contain quotes from David Gordon.  The Court finds nothing in that article to be relevant to Plaintiffs' current request, though.  Nor does the article suggest that the Gordon Parties will make any future actionable, false statements about Plaintiffs.  That being the case, Plaintiffs have failed to carry their burden of showing that they are entitled to an injunction against the Gordon Parties making "false disparaging statements about either of the Plaintiffs, the ownership of the Nantucket Wine & Food Festival, or its operations."  Doc. No. 91-1 at 2.  Of course, if the Gordon Parties do make, or threaten to make, such statements while this litigation is pending, Plaintiffs are free to renew their false-statement request.

C.    Balance of Hardships

With respect to the remaining corrective-disclosures and website requests, the balance of equities tips in Plaintiffs' favor.  Plaintiffs' Festival has been running annually—except for two years—since 1997.  Bean has been involved since 2007.  The Festival is Plaintiffs' sole business. The Gordon Parties, on the other hand, are new entrants to the food-and-wine-event space.  They have other, established businesses in wine-and-liquor retail and distribution, as well as in catering.  The effect on Plaintiffs of a denial of injunctive relief would therefore be harsher than would the effect on the Gordon Parties of a grant of injunctive relief.  See Spruce Env't Techs.,

2015 WL 4038802, at *5 ("[A]ny potential harm Festa endures from being required to discontinue its false advertising is entirely self-inflicted.").

Additionally, there is no evidence before the Court that Plaintiffs engaged in any wrongdoing here.  The Gordon Parties have hinted at issues with Bean's management of the Festival, but that does not suggest inequitable behavior.  White Elephant—not the Gordon Parties—did accuse Plaintiffs of the improper use of its name and logo via a cease-and-desist letter in July 2024, but Plaintiffs promptly removed the offending use.  See Doc. No. 84-86.  In contrast, the Gordon Parties have yet to show any contrition—or even offer any credible explanation—for their false statements.

Sipping on ice, the Gordon Parties point to Plaintiffs' delay in moving for a preliminary injunction.  At the motion hearing, counsel for the Gordon Parties suggested that Plaintiffs timed this motion to affect the Select Board's consideration of permits for the Festival and the Experience.  The Gordon Parties have presented no evidence of such an intent by Plaintiffs.  What is more, the Gordon Parties agreed, prior to the filing of the present motion, that "they would not use against Plaintiffs time that the parties and counsel devote to efforts to narrow or resolve the dispute before seeking injunctive relief."  Doc. No. 39 ¶ 6.  As such, the Court does not hold that delay against Plaintiffs.

  D.  Public Interest

Finally, the public interest also favors entry of preliminary-injunctive relief.  While the public has an interest in fair competition, this is not a case of fair competition.  It is one in which one competitor made false statements about another competitor's business—at least knowingly, if not intentionally—and then failed to adequately remedy those falsehoods.  Granting Plaintiffs' corrective-disclosures and website requests would serve the public interest in accurate, accessible information about competitors in a marketplace.  Spruce Env't Techs., 2015 WL 4038802, at *5

(finding that "it is in the public interest to remove false advertising from the marketplace," notwithstanding public interest in competition).

     E.    <u>Security Under Rule 65(c)</u>

Under Federal Rule of Civil Procedure 65(c), a court may issue a preliminary injunction only "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Neither party addressed what a proper security amount would be in this case.  <u>See</u> Doc. No. 55 at 24 n.10 (requesting security but not suggesting any specific amount).  As such, the Court orders Plaintiffs to post a bond of $10,000 within ten days of this Memorandum & Order.

IV.   <u>CONCLUSION</u>

The Gordon Parties' Motion to Strike, Doc. No. 72, is DENIED.  The Plaintiffs' Motion for Preliminary Injunction, Doc. No. 37, is ALLOWED IN PART and DENIED WITHOUT PREJUDICE IN PART.  It is allowed with respect to the corrective-disclosures and website requests and denied without prejudice with respect to the false-statements request.

Simultaneously with this Memorandum & Order, the Court separately issues the proposed injunction, amended to conform to the terms described herein.  Plaintiff shall post a bond of $10,000 within ten days of this Memorandum & Order.  The parties shall, within fourteen days of issuance of this Memorandum & Order, file a joint status report stating their joint or separate positions regarding the schedule upon which this case should proceed and any other matter they wish to bring to the Court's attention.

                SO ORDERED.

                 /s/ Leo T. Sorokin
                United States District Judge